AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
SEP 23 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

One Black Samsung Cellphone
Seized as DEA Exhibit N-9 (Target Device 1)

Case No. **19MJ4130**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1 (incorporated herein)

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1 (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Secs. 841, 846; 21 U.S.C. Secs. 843(b); 18 U.S.C. Secs. 922(g), 924(c) | Distr. and Poss. with Intent to Distr. CS (and Conspiracy); and Unlawful Use of a Comm. Fac.; Felon in Possession; Poss. Firearm in Furth. of Drug. Traff. |

The application is based on these facts:

See attached Affidavit (incorporated herein)

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Daniel Nickel, DEA Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/23/2019

*Judge's signature*

City and state: San Diego, California

Hon. F.A. Gossett, U.S. Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>(1) One Black Samsung Cellphone Seized as DEA Exhibit N-9 (**Target Device 1**);<br><br>(2) One Black Apple iPhone Seized as DEA Exhibit N-10 (**Target Device 2**);<br><br>(3) One Pink Apple iPhone Seized as DEA Exhibit N-11 (**Target Device 3**); and<br><br>(4) One Silver and Black Samsung Cellphone Seized as DEA Exhibit N-12 (**Target Device 4**) | **AFFIDAVIT OF TASK FORCE OFFICER DANIEL NICKEL IN SUPPORT OF A SEARCH WARRANT** |

I, Task Force Officer Daniel Nickel, having been duly sworn, declare and state as follows:

## I.
## INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search the following electronic devices:

(1) One Black Samsung Cellphone Seized as DEA Exhibit N-9 (**Target Device 1**);

(2) One Black Apple iPhone Seized as DEA Exhibit N-10 (**Target Device 2**);

(3) One Pink Apple iPhone Seized as DEA Exhibit N-11 (**Target Device 3**); and

(4) One Silver and Black Samsung Cellphone Seized as DEA Exhibit N-12 (**Target Device 4**) (collectively, the **Target Devices**)

1  and seize evidence of crimes, specifically, violations of Title 21, United States Code,
2  Sections 841 and 846, Distribution and Possession with Intent to Distribute Controlled
3  Substances (and Conspiracy to do the same); Title 21, United States Code, Section 843(b),
4  Unlawful Use of a Communication Facility; Title 18, United States Code, Section 922(g),
5  Felon in Possession of Ammunition and/or a Firearm; and Title 18, United States Code,
6  Section 924(c)(1), Possession of a Firearm in Furtherance of a Drug Trafficking Crime (the
7  **Target Offenses**).

8     2. The **Target Devices** were seized on August 23, 2019 from Defendant Julian
9  SANDOVAL-SALAS when members of the Drug Enforcement Administration (DEA)
10 Narcotics Task Force (NTF) Team 2 executed a search warrant (19mj3456) at his residence
11 on Newton Avenue in San Diego. After searching his residence, SANDOVAL-SALAS
12 was arrested for possessing with the intent to distribute controlled substances and being a
13 felon in possession of ammunition and a firearm. Specifically, SANDOVAL-SALAS was
14 arrested for possessing approximately 451.5 grams gross weight of heroin, nine Oxycodone
15 pills, approximately 84.4 grams gross weight of cocaine, approximately 32 grams gross
16 weight of a white powdery substance suspected to be fentanyl, indicia of sales of narcotics
17 (including a digital scale, a box of sandwich bags, and a bag of smaller one inch by one
18 inch plastic baggies), a 308 Polytech Rifle, 40 caliber pistol ammunition and the **Target**
19 **Devices**. The **Target Devices** are currently stored as evidence at the DEA located at 4560
20 Viewridge Avenue, San Diego, California 92123 as Property Items N-9, N-10, N-11 and
21 N-12 under case number R2-19-0183.

22     3. The search of the **Target Devices** supports an investigation and prosecution
23 of Defendant for the Target Offenses. Based on the information below, there is probable
24 cause to believe that a search of the **Target Devices**, as described in Attachments A1–A4
25 will produce evidence of the Target Offenses, as described in Attachments B1–B4.

26     4. The following is based upon my experience and training, investigation, and
27 consultation with other law enforcement agents and officers experienced in narcotics
28 violations, including the Target Offenses. The evidence and information contained herein

2

was developed from interviews and my review of documents and evidence related to this case. Because I make this affidavit for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only sets forth those facts believed to be necessary to establish probable cause. Dates and times are approximate, and refer to Pacific Standard Time (PST) unless otherwise specified.

## II.
## AFFIANT'S EXPERIENCE AND TRAINING

5. I am a Detective with the San Diego County Sheriff's Department (SDSD) and am currently assigned as a cross-sworn Task Force Officer (TFO) with the Drug Enforcement Administration's (DEA) Narcotic Task Force (NTF). I have been a TFO with NTF for almost nine years. I have been employed with the San Diego County Sheriff's Department for over twenty years, and been a Detective for the past twelve years. Prior to my current assignment with NTF, I was assigned to the Vista Street Narcotic and Gang Detail (SNGD) for about three years.

6. I have had extensive training in the investigation of drug related crimes and the enforcement of laws concerning controlled substances as found in Title 21 United States Code and the California Health and Safety Code. During my law enforcement career, I have investigated illicit controlled substance trafficking: to include the importation, distribution, manufacture and cultivation of illegal substances, including fentanyl. During the last almost nine years, I have been involved in investigating Narcotics Trafficking Organizations (NTO).

7. I have investigated illicit controlled substance trafficking in San Diego and surrounding areas. In the course of my employment I have made in excess of 300 arrests for violations involving such controlled substances. I have become familiar with the ordinary meaning of controlled substance slang and jargon, and I am familiar with the manners and techniques of manufacturers and traffickers in controlled substances as practiced locally. I have investigated all aspects of drug trafficking organizations from

3

street-level distributors to large-scale traffickers. I have interviewed and operated informants, executed search warrants, assisted in the purchase of drugs in an undercover capacity, arrested and interviewed subjects, conducted physical surveillance, utilized electronic and video surveillance, and worked with prosecutors in the litigation of state and federal drug cases.

8. I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

9. I am familiar with narcotics traffickers' methods of operation including the distribution, storage, and transportation of narcotics and the collection of money proceeds of narcotics trafficking and methods of money laundering used to conceal the nature of the proceeds. I have had training in investigations regarding the unlawful distribution and possession of controlled substances, as well as conspiracies associated with criminal narcotics, in violation of Title 21, United States Code, Sections 841 and 846.

10. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have learned that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, pagers, and portable radios to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involved in the smuggling and trafficking of narcotics generate many types of evidence including, but not limited to, cellular phone-related evidence such as voice-mail messages referring to the arrangements of travel and payment, names, photographs, text messaging, and phone numbers of co-conspirators. Typically, drug traffickers are in telephonic contact with co-conspirators immediately prior to and following their illicit transactions to negotiate prices and quantities, coordinate meeting times and locations, and then to discuss future transactions

or future payments if the narcotics were "fronted" (delivered without being paid for in advance).

11. Based upon my training and experience as a detective and TFO, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug traffickers and their co-conspirators will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b. Drug traffickers and their co-conspirators will use cellular/mobile telephones to negotiate the price, type, and quantity of drugs being sold to customers, and received from suppliers.

    c. Drug traffickers and their co-conspirators will use cellular/mobile telephones to arrange times and places to meet with customers to deliver illegal drugs, and to arrange times and places to meet with suppliers to receive illegal drugs.

    d. Drug traffickers and their co-conspirators will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as ongoing enforcement operations in their area.

    e. Drug traffickers and their co-conspirators will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

    f. Drug traffickers and their co-conspirators often use cellular/mobile telephones to record money owed to customers and suppliers and as evidence of past orders received and/or delivered.

    g. The use of cellular telephones and other mobile communication devices by conspirators or drug traffickers tends to generate evidence that is stored on the device,

5

including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

12. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that device.

13. Based upon my training and experience as a detective and TFO, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, based upon my training, education, and experience investigating these conspiracies, I have learned that searches of cellular/mobile telephones and/or other mobile communication devices yields evidence:

    a. tending to identify co-conspirators that distribute or possess with the intent to distribute cocaine, heroin, fentanyl, methamphetamine, or other federally controlled substances within the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of or the possession with the intent to distribute cocaine, heroin, fentanyl, methamphetamine, or other federally controlled substances within the United States;

6

       c.    tending to identify co-conspirators, criminal associates, or others involved in the distribution of or the possession with intent to distribute cocaine, heroin, fentanyl, methamphetamine, or other federally controlled substances;

       d.    tending to identify travel to or presence at locations involved in the distribution of or possession with intent to distribute cocaine, fentanyl, methamphetamine, or other federally controlled substances, including stash houses, residences used to prepare or process controlled substances, and/or delivery points;

       e.    tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

       f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III.

## STATEMENT OF PROBABLE CAUSE

14. In July of 2019, a confidential source (CS)[1] was introduced to SANDOVAL-SALAS and provided with SANDOVAL-SALAS's phone number (760-556-2716). During their initial contact, the CS purchased approximately four ounces of fentanyl powder from SANDOVAL-SALAS. The CS went on to conduct an additional controlled purchase of fentanyl powder from SANDOVAL-SALAS as described in detail below.

15. After the CS was provided phone number 760-556-2716 for SANDOVAL-SALAS, I subpoenaed subscriber information for that phone number and received a

---

[1] The CS is currently paroled into the United States and is cooperating in exchange for immigration benefits. The CS does not have any criminal convictions but was previously deported in 2005 after making a false claim to United States citizenship. The CS also has a 2008 arrest for giving a false identification to a peace officer, but it is not clear whether it resulted in a conviction.. The CS has received approximately $4010 during the course of this investigation to cover both expenses and as compensation for work. The CS has provided reliable information because, in part, it has been corroborated by physical surveillance, records checks, text messages, call logs, recorded conversations, and other confidential sources.

7

response from T-Mobile / Metro PCS Wireless indicating the number was subscribed under the name "Jose Zuniga" and associated with 4500 Newton Avenue, California 92113 [this address does not appear to exist].

**A. CONTROLLED PURCHASE OF FENTANYL ON JULY 30, 2019**

16. On July 29, 2019, the CS contacted SANDOVAL-SALAS at phone number 760-556-2716 to discuss a transaction involving fentanyl. SANDOVAL-SALAS agreed to sell fentanyl to the CS on the following day.

17. On July 30, 2019, prior to the CS's meeting with SANDOVAL-SALAS, TFO Espiritu and I met with the CS at a pre-arranged location. TFO Espiritu searched the CS and his/her vehicle for contraband with negative results and we provided the CS with $4000 in funds to purchase the fentanyl.

18. On July 30, 2019, at approximately 5:25 p.m., the CS contacted SANDOVAL-SALAS at 760-556-2716 and informed SANDOVAL-SALAS that he/she was at 1410 S. 43rd Street waiting to meet SANDOVAL-SALAS.

19. On July 30, 2019, at approximately 4:30 p.m., members of the DEA's NTF Team 2 established surveillance outside SANDOVAL-SALAS's residence, located at 4300 Newton Avenue, #28 in San Diego, California (the "**Target Address**"). Members of Team 2 also established surveillance around 1410 S. 43rd Street in San Diego, where the controlled purchase was expected to occur. At approximately 4:55 p.m., Special Agent Morimoto observed a red Chrysler PT Cruiser bearing California license plate 7HYL301 parked next to garage 28, the garage associated with the **Target Address**.

20. Records checks later revealed that the PT Cruiser was registered to DOMEX Customs at 1112 National City Boulevard in National City, California.

21. At approximately 5:33 p.m., Special Agent Morimoto observed the red PT Cruiser leave the **Target Address**'s area and drive towards S. 43rd Street in San Diego.

22. At approximately 5:35 p.m., TFO Knece observed the PT Cruiser enter the parking lot at 1410 S. 43rd Street. Two Hispanic males were seated in the PT Cruiser. As the driver exited the vehicle, I positively identified him as SANDOVAL-SALAS based on

8

his California driver's license photograph and my prior contacts with SANDOVAL-SALAS. SANDOVAL-SALAS was wearing a green baseball hat, jeans, and a black t-shirt.

23. During this meeting, the CS asked SANDOVAL-SALAS if he still had more fentanyl. SANDOVAL-SALAS stated that he had more fentanyl and was willing to sell it to the CS. The CS also asked SANDOVAL-SALAS about purchasing methamphetamine. SANDOVAL-SALAS responded that he would sell one pound of methamphetamine for $1600.00 but if the CS bought more than two pounds, SANDOVAL-SALAS would sell it for $1400 per pound. The CS told SANDOVAL-SALAS he/she would contact him to arrange another purchase. After this conversation, SANDOVAL-SALAS removed a white t-shirt from the PT Cruiser and placed the white t-shirt in the back of the CS's vehicle.

24. After the controlled purchase, TFO Espiritu and I met with the CS in a neutral location. The CS provided the white t-shirt that SANDOVAL-SALAS placed in his car. Inside the white t-shirt, there was a Ziploc bag containing a white powdery substance suspected to be fentanyl. TFO Espiritu and I searched the CS and the CS's vehicle for additional contraband with negative results.

25. The powdery substance that SANDOVAL-SALAS sold the CS field-tested positive for the properties of fentanyl and had a gross weight of approximately 278.2 grams. However, after the DEA's Southwest Laboratory conducted further analysis, the substance was determined to be 116.1 grams of a mixture or substance containing a detectable amount of methamphetamine, and not fentanyl.

**B.    SEARCH OF RESIDENCE LOCATED ON NEWTON AVENUE**

26. On August 14, 2019, United States Magistrate Judge Goddard signed a warrant authorizing the search of the **Target Address** and his 2011 Chevrolet Malibu bearing California license plate 6STU547 (Case No. 19mj3456).

27. On August 23, 2019, at approximately 6:30 a.m., agents and officers established surveillance outside the Target Residence in preparation to execute the search warrant. At approximately 11:00 a.m., Special Agent Morimoto observed SANDOVAL-SALAS drive up to the Target Residence in the Chevrolet Malibu, but then SANDOVAL-

9

SALAS backed up and parked nearby on S. 44th Street. I contacted SANDOVAL-SALAS after he exited the vehicle and placed him under arrest for a violation of Title 21, United States Code, Section 841. When I approached SANDOVAL-SALAS, he was holding **Target Device 1** and **Target Device 2** in his hands and I seized them as Exhibits N-9 and N-10, respectively.

28. I searched SANDOVAL-SALAS incident to his arrest and discovered a plastic baggie containing a white powdery substance in the back left pocket of his jeans. Another plastic baggie with a white powdery substance was found inside SANDOVAL-SALAS's wallet, which was inside his back right jeans pocket. These substances weighed a total of approximately 32.0 grams and the field tests were inconclusive.

29. Special Agent Hedquest and TFO Hoover searched SANDOVAL-SALAS's Chevrolet Malibu and discovered **Target Device 3** in the center console. I seized it as Exhibit N-11.

30. At approximately 11:15 a.m., DEA agents and officers executed the search warrant (19mj3456) on the Target Residence. Upon entering the Target Residence, agents and officers encountered a female, F.S., sitting at a table downstairs. F.S. was later identified as SANDOVAL-SALAS's mother. They also encountered a male, A.A., sitting on the downstairs couch. A.A. is believed to be a friend of SANDOVAL-SALAS's sister. SANDOVAL-SALAS's sister, W.S., was upstairs when officers entered the house and voluntarily came downstairs and was detained during the search.

31. Officers Espiritu and Shadoan conducted a search of SANDOVAL-SALAS's bedroom. Inside, they found a grocery bag on the nightstand. Inside, were two bindles containing a white powdery substance, a black digital scale, a box of sandwich bags, a bag containing smaller one inch by one inch plastic baggies, and a gold Visa Debit Card with a white powdery residue on it. The white powdery substance field tested positive for the properties of cocaine and weighed approximately 49 grams. During the search of SANDOVAL-SALAS's room, officers and agents found documents confirming

1  SANDOVAL-SALAS's dominion over the room, including paperwork for a motorcycle registration with his name.

32. Inside SANDOVAL-SALAS's bedroom, there was a Gucci bag sitting on top of a dresser. **Target Device 4** was discovered inside the Gucci bag and seized as Exhibit N-12.

33. Agents and officers also searched a white dresser located in the Target Residence's garage. In the third drawer of the dresser, agents and officers discovered two plastic baggies containing a black tar like substance. Officer Espiritu field tested the substance and it tested positive for the properties of heroin. The substance had a gross weight of approximately 451 grams. Based on my training and experience, 451 grams of heroin is a distributable amount and not an amount typically possessed merely for personal use. Agents and officers also discovered nine blue pills in the dresser that each contained a "30" on one side and an "M" on the other side. In the top drawer of the dresser, agents and officers discovered two boxes of Federal 40 caliber S&W 180 grain rounds. The boxes contained a total of 81 rounds.

34. In a green dresser in the garage, agents and officers located a plastic grocery bag containing a white powdery substance. The substance weighed a total of approximately 35.4 grams and the field tests were inconclusive.

35. In the Southeast corner of the garage, agents and officers discovered a 308 Polytech China rifle and 20 round magazine. The rifle had a serial number of 04547.

36. Based upon my experience investigating narcotics traffickers and the particular investigation in this case, there is probable cause to believe that SANDOVAL-SALAS used the **Target Devices** to coordinate the distribution of federally controlled substances in the period leading up to August 23, 2019. In addition, I believe that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information may be stored in the memory of the **Target Devices**, which may identify other persons involved in narcotics trafficking activities, including the sources of the methamphetamine, cocaine,

11

heroin, and suspected fentanyl. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to SANDOVAL-SALAS's narcotics distribution activites, such as telephone numbers, made and received calls, contact names, e-mail addresses, appointment dates, messages, pictures, and other digital information may be stored in the memory of the **Target Devices**.

37. Finally, I also have learned that narcotics trafficking activities entail advanced planning to successfully acquire a supply chain and establish a distribution network. Given this, I request permission to search the **Target Devices** for items listed in Attachments B1–B4 for the period of May 24, 2019,[2] to August 23, 2019.

## IV.

## METHODOLOGY

38. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive

---

[2] SANDOVAL-SALAS was sentenced to ten months in custody for a supervised release violation on October 5, 2018 in Case No. 13-cr-1692-MMA. It is my understanding he was in custody on this supervised release violation from approximately July 25, 2018 to May 24, 2019.

12

equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

39. Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the **Target Devices** and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

40. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## V.
## CONCLUSION

41. Based on all of the facts and circumstances described above, my training and experience, and consultations with other law enforcement officers, there is probable cause to conclude that Defendant utilized the **Target Devices** to facilitate the commission of the Target Offenses.

42. Probable cause exists to believe that evidence of the aforementioned offenses exists on the **Target Devices** for the period of May 24, 2019, to August 23, 2019.

43. Because the **Target Devices** were promptly seized during the investigation of Defendant's drug trafficking activities and has been securely stored, there is probable cause

13

to believe that evidence of illegal activity committed by Defendant continues to exist on the **Target Devices**.

44. Based upon my experience and training, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I believe that the items to be seized set forth in Attachments B1–B4 (incorporated herein) are likely to be found in the property to be searched described in Attachments A1–A4 (incorporated herein). Therefore, I respectfully request that the Court issue a warrant authorizing me, or another federal law enforcement agent specially trained in digital evidence recovery, to search the items described in Attachments A1–A4, and seize the items listed in Attachment B1–B4.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Task Force Officer Daniel Nickel
Drug Enforcement Administration

Sworn to and subscribed before me this ___23___ day of September, 2019.

HON. F.A. GOSSETT
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A-1**

PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violations of Title 21, United States Code, Sections 841 and 846, Distribution and Possession with Intent to Distribute Controlled Substances (and Conspiracy to do the same); Title 21, United States Code, Section 843(b), Unlawful Use of a Communication Facility; Title 18, United States Code, Section 922(g), Felon in Possession of Ammunition and/or a Firearm; and Title 18, United States Code, Section 924(c)(1), Possession of a Firearm in Furtherance of a Drug Trafficking Crime (the **Target Offenses**) is:

> One Black Samsung Cellphone
> Seized as DEA Exhibit N-9
> Under Case Number R2-19-0183
> **(Target Device 1)**

**Target Device 1** is currently in the possession of the Drug Enforcement Administration (DEA) San Diego Field Division (SDFD) located at 4560 Viewridge Avenue, San Diego, CA 92123.

## **ATTACHMENT B-1**

Authorization to search **Target Device 1** described in Attachment A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in **Target Device 1** for evidence described below. The seizure and search of **Target Device 1** shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of May 24, 2019 to August 23, 2019:

a. tending to identify co-conspirators that possess with the intent to distribute cocaine, heroin, fentanyl, methamphetamine, or other federally controlled substances;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of and/or the possession with the intent to distribute cocaine, heroin, fentanyl, methamphetamine, or other federally controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of and/or the possession with intent to distribute cocaine, heroin, fentanyl, methamphetamine, or other federally controlled substances;

d. tending to identify travel to or presence at locations involved in the distribution of or possession with intent to distribute cocaine, heroin, fentanyl, methamphetamine, or other federally controlled substances, including stash houses, residences used to prepare or process controlled substances, and/or delivery points;

e. tending to identify the user of, or persons with control over or access to, **Target Device 1**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of the **Target Offenses**.